United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

HOBIE H. TRIVITTE, Administrator of the Estate of Eleanor Ann Trivitte,

Plaintiff,

v.

HEALTHCOMP, INC., et al.,

Defendant.

Case No.: C04-3125 PVT

**FINDINGS OF FACT AND CONCLUSIONS OF LAW; AND JUDGMENT**

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for court trial before Magistrate Judge Patricia V. Trumbull on May 1, 2006. Based on the evidence and argument presented at trial, the court makes the following findings of fact and conclusions of law, and based thereon enters judgment in favor of Defendants.

### A. FINDINGS OF FACT

1. Eleanor Ann Trivitte was a participant of the Northern California Golf Association Employee Health Care Plan (the "Plan").

2. The Plan is a self-funded employee welfare benefit plan subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132, et seq.

United States District Court
For the Northern District of California

3. The Northern California Golf Association is the "Plan Administrator" for the Plan.

4. HealthComp Inc. is the licensed Third Party Claims Administrator for the Plan.

5. The Plan confers discretionary authority to the Plan Administrator to construe and interpret the terms of the Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes that may arise relative to a Plan Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan.

6. Ms. Trivitte died following a vehicle accident that occurred on September 2, 2002.

7. Prior to her death, Ms. Trivitte received medical treatment for the injuries she sustained in the accident.

8. Ms. Trivitte's son, Hobie Trivitte, retained Vincent Kilduff to represent him in connection with a wrongful death action on his own behalf, and also to handle his mother's estate.

9. Letters of Administration were issued authorizing Hobie Trivitte ("Trivitte") to administer his mother's estate.

10. At some point, Trivitte asserted a wrongful death claim–solely on his own behalf– against third parties Ronald Landiesel and Vanessa Sandoval. Mr. Kilduff and Trivitte failed to assert any claims against the third parties on behalf of the Estate of Eleanor Ann Trivitte (the "Estate").

11. Trivitte settled his claims against Ronald Landiesel and Vanessa Sandoval, and their insurer, for $50,000.00.

12. At some point, Mr. Kilduff presented a claim for underinsured motorist insurance benefits to Amco, Ms. Trivitte's automobile insurer.

13. On or about April 2, 2003, Mr. Kilduff was advised that Ms. Trivitte was a participant in the Plan.

14. On April 16, 2003, Mr. Kilduff sent a letter to HealthComp asking them to pay certain medical expenses incurred for treatment of Ms. Trivitte's injuries before her death, and attaching copies of statements from the providers. This letter constituted

United States District Court
For the Northern District of California

a timely claim by the Estate for benefits under the Plan.[1]

15. On April 28, 2003, Linda Tovar, a Claim Team Lead at HealthComp, called the hospital about getting the UB 92 and HCFA 1500 forms, which she needed in order to process the Estate's claim. She was informed that they could not give her the information because the matter was in litigation.

16. Ms. Tovar then called Mr. Kilduff. She advised him she would need UB 92 and HCFA 1500 forms in order to process the claim, because there was not enough information on either billing to process the claim. She told him she had tried to get the forms, but couldn't. She informed him that either he or whoever was in litigation would need to contact the providers and ask for the forms so HealthComp could send the forms to the PPO Network for pricing, and they in turn would tell HealthComp the allowable amount.

17. Mr. Kilduff either did not understand that Ms. Tovar was asking him to obtain the forms for HealthComp, or if he did understand at the time he either forgot to follow through, or else chose to ignore the request.[2]

18. At some point in time, the Estate received $5,000 from Ms. Trivitte's car insurance.

19. There was no contact between the Estate and HealthComp between April 28, 2003 and August 16, 2003.

20. On August 16, 2003, Mr. Kilduff again wrote to HealthComp asking that they pay the medical expenses.

21. When Ms. Tovar received Mr. Kilduff's August 16, 2003 letter, she had not

---

[1] The Plan states that "[a] request for Plan benefits will be considered a claim for Plan benefits . . . ." (Plan at p. 67.) Although the Plan generally requires claims to be submitted within 45 days after the charges are incurred, there is an exception if it is not reasonably possible to submit the claim within that time and the claim is submitted within one year from the date the charges are incurred. In the present case, it was not reasonably possible for Ms. Trivitte to submit the claim within 45 days because she died the day after the accident, and was hospitalized for that day. The attorney for the Estate testified that he first learned of Ms. Trivitte's coverage under the Plan on April 2, 2003. Thus he arguably could not have earlier submitted the claim. He submitted the claim just two weeks later on April 16, 2003. And at trial, Defendants did *not* contend the April 16, 2003 letter was not a timely claim, nor offer any testimony or evidence that would support such a contention.

[2] For reasons discussed below, whether or not Mr. Kilduff understood Ms. Tovar was asking him to obtain the forms is immaterial to the court's decision.

United States District Court
For the Northern District of California

received the UB 92 and HCFA 1500 forms. She called Mr. Kilduff's office and left a voice mail message saying she needed the forms to process the claims.

22. Amco settled the claim for underinsured motorist insurance benefits by agreeing to pay $200,000.00. Amco named the Estate on both in the Underinsured Motorist Receipt and Release and on the $200,000.00 check.[3]

23. On February 6, 2004, Mr. Kilduff again wrote to HealthComp asking that they pay the medical expenses.

24. There was no further contact between the Estate and HealthComp between February 6, 2004 and May 24, 2004.

25. This action was filed on May 24, 2004.

26. On July 14, 2004, HealthComp's Legal Compliance Manager, Scott Aitchison, phoned Mr. Kilduff, and documented the call in a follow-up letter that same day. Mr. Aitchison informed Mr. Kilduff that HealthComp had no record of receiving any claims for Ms. Trivitte in connection with her fatal accident, and thus HealthComp had not processed any such claims nor made any adverse determinations on the matter. Along with his letter, Mr. Aitchison sent Mr. Kilduff a Group Medical Claim Form, and excerpts from the Plan regarding how to submit a claim.[4] Mr. Aitchison asked Mr. Kilduff to follow the procedure set forth in the

---

[3] At trial, the Estate offered testimony from Mr. Kilduff regarding a purported "agreement" between himself and the insurer to the effect that the naming of the Estate on the release and the check was in error. The Estate also sought to enter into evidence a letter Mr. Kilduff purportedly wrote to the insurer confirming such an agreement. The court sustained hearsay objections to both Mr. Kilduff's testimony and the letter. The Estate argued that the testimony and the letter were not hearsay because they constituted the operative terms of an agreement and showed Mr. Kilduff's state of mind. Mr. Kilduff's state of mind is not relevant here. Further, the words of an agreement are only an exception to the hearsay prohibition where the words uttered are not offered to prove the truth of the matter asserted. *See* FED.R.EVID. 801(c) Advisory Note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.") Here, the words uttered *were* offered to prove the truth of the matter asserted, i.e. that the insurer had named the Estate on the release and the check "by mistake." Thus, Mr. Kilduff's testimony and the letter are inadmissible hearsay. This ruling furthers the purposes of the hearsay rule because no one from the insurance company was available for Defendants to cross-examine.

[4] The excerpts he sent were not from the version of the Plan in effect at the time of the accident, but that is immaterial to this case.

United States District Court
For the Northern District of California

plan to submit the claim, but noted that HealthComp was not guaranteeing the claim would be paid.

27. Mr. Kilduff filled in and returned the Group Medical Claim Form to HealthComp, but expressly noted he was not conceding that no claim had previously been filed.

28. On August 4, 2004, HealthComp issued written denials of the Estate's claims. The stated reasons for denials were "Unable to verify underlying claim–hospital UB92 needed. Possible Third Party Liability–accident details needed. Timely filing period has expired" and "Req'd info never rec'd–UB92 unable to obtain from provider and patient. Possible TPL – need accident details. Timely filing period has expired"

## B. Legal Analysis

### 1. *De Novo* Review Is Warranted in this Case

A district court reviews an ERISA plan benefits denial "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where a plan does give the administrator such discretionary authority, courts review a claim denial under an abuse of discretion standard. *See Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (9th Cir. 1996). In assessing whether a claim administrator abused its discretion, the court considers whether the claim denial was unreasonable. *Clark v. Washington Teamsters Welfare Trust*, 8 F.3d 1429, 1432 (9th Cir. 1993).

However, even if a plan gives the administrator discretionary authority, as is the case here, *de novo* review is warranted if the plan administrator fails to timely exercise that discretion and act on the claim. *See Jebian v. Hewlett-Packard Co.*, 349 F.3d 1098, 1106-07 (9th Cir. 2003) *cert. denied*, 125 S.Ct. 2956 (2005) (" '[T]o be entitled to deferential review, not only must the administrator be given discretion by the plan, but the administrator's decision in a given case must be a valid exercise of that discretion.' "), quoting *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003).

In the present case, Defendants failed to exercise their discretion within the time allowed under the Plan. The Plan provides that:

> "A Plan Participant will be notified within 90 days of receipt of the claim as to the acceptance or denial of a claim and if not notified within 90 days, the claim shall be deemed denied." (Plan at p. 68)

As mentioned above, Mr. Kilduff's April 16, 2003 letter to HealthComp constituted a timely claim for benefits. Defendants failed to make any decision on the claim for well over 90 days. Thus, the Estate's claim was "deemed denied" as of July 15, 2003. Further, Defendants are not entitled to invoke the safe harbor allowed for plan administrators who allow the time to lapse, but are otherwise engaged in a "genuine, productive, ongoing dialogue" that substantially complies with a plan's timeline. *See Jebian*, 349 F.3d at 1105-08.

Here, Defendants did almost nothing to administer the claim during the allowed time. They failed to send written notice to the Estate's attorney stating what additional information they needed. They failed to put their request to the medical providers for the UB92 and HCFA 1500 forms in writing. They failed to inform the Estate's attorney how to submit a formal claim, and did not even send him a claim form (which includes an authorization for providers to release information regarding the patient). They did not ask the Estate's attorney to provide any other authorization for providers to release information. Finally, they did not contact the Estate's attorney again prior to the expiration of the 90 days to ensure he understood they were waiting for him to obtain the forms for them.

Even if Plaintiff's counsel intentionally ignored the request for *him* to obtain the forms, that would not excuse Defendants from fulfilling the rest of their obligations under ERISA. Had Defendants followed up with a written request for the information, and then exercised their discretion and issued a timely written denial based on Plaintiff's failure to assist in obtaining the information, Defendants would have been entitled to the abuse of discretion standard and a finding that they did not abuse their discretion. (More likely, such written communications would have inspired more cooperation from Plaintiff's counsel and avoided this lawsuit.) But that is not what happened here. As Scott Aitchison admitted in his July 14, 2004 letter to Mr. Kilduff, over a year after the claim was submitted HealthComp had not processed the Estate's claim, nor made any

United States District Court
For the Northern District of California

adverse determinations on the matter. Because Defendants failed to exercise their discretion, they are not entitled to the abuse of discretion standard of review.

The purported written denials issued in August of 2004 were untimely and did not cure Defendants' prior failure to administer the claim. In any event, *de novo* review of those denials would be appropriate because the Plan Administrator's apparent conflict of interest tainted the decision. *See Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1323 (9th Cir. 1995) (*de novo* review appropriate if apparent conflict of interest inherent in a self-funded plan taints the decision of the plan administrator).

The August 2004 "denials" cite both a failure to receive requested information from either Plaintiff or the providers, *and* the expiration of the timely filing period. These two rationales are inconsistent under the facts of this case. The claims were only untimely if July 15, 2004–the date Plaintiff's counsel returned the official claim form–is used as the filing date.[5] The failure to receive requested information is only a valid reason for denial if Defendants made reasonable efforts to obtain the information after the claims were filed. Given that the denials were dated August 4, 2004, using a filing date of July 15, 2004 would mean that Defendants allowed less than three weeks for receipt of the information they needed. Defendants' belated, post-litigation request that Plaintiff submit a claim form, the inconsistent reasons offered for the denials, and the fact the purported denials did not meet the requirements of either the Plan or ERISA,[6] all create a strong inference that Defendants' actions were designed to protect their own self-interest[7] rather than to exercise their discretion and administer the Plan in good faith.

---

5 *See* footnote 1, *supra*.

6 The denials fail to meet all the requirements set forth on pages 67 & 68 of the Plan document, as well as the requirements for the contents of a denial that were set forth in 29 C.F.R. section 2560.503-1(g) in that the denials do not refer to "the specific plan provisions on which the determination is based," and do not describe "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."

7 It was in the Northern California Golf Association's self-interest to deny the claim because it funds the Plan and thus could save money by denying claims. It was in HealthComp's self-interest to deny the claim to save the cost of any further administration the claim, since HealthComp receives only $10.00 per claim regardless of the amount of time and expense involved in administering each claim. Moreover, it was in both Defendants' self-interest to find an excuse to deny the claim in order to cover up for their prior failure to properly administer the claim.

United States District Court
For the Northern District of California

**2. Admission of Evidence Outside the Administrative Record Is Warranted.**

When the standard of review in an ERISA benefits case is *de novo*, the court has discretion to hear evidence outside the administrative record. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995). Courts admit evidence outside the administrative record "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Ibid.* (quoting *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc)). In the present case, admission of evidence outside of the administrative record is warranted, because the record contains almost none of the information necessary to administer the claim.

**3. Determination of Benefits Due Under the Plan**

In an action for benefits under ERISA, the Plaintiff carries the burden to establish the amount of benefits due, if any. *See, e.g., McMackins v. Monsanto Company Salaried Employees' Pension Plan*, 98 F.Supp.2d 1073, 1081 (E.D. Mo. 2000) ("plaintiff has the burden of presenting evidence to show the amounts she is due"). Plaintiff failed to carry that burden in this case.

The court expected, and would have admitted into evidence, the UB92 and HCFA 1500 forms related to Ms. Trivitte's medical treatments, evidence of what the "allowable charges" were as defined by the Plan, and further evidence regarding other available insurance and third party liability. Unfortunately, Plaintiff did not offer into evidence the UB92 and HCFA 1500 forms, nor any evidence of what the "allowable charges" were as defined by the Plan (nor even which, if any, of the providers were "Network Providers"). And very little evidence regarding other available insurance and third party liability was offered into evidence.

Although Plaintiff submitted some billing statements showing how much the providers *billed*, Plaintiff failed to present any evidence that would allow the court to determine what portion of the billed amounts are "covered charges" under the Plan.

The Plan includes the following provisions:

> "Medical benefits apply when covered charges are incurred by a Covered Person for care of an Injury or Sickness and while the person is covered for these benefits under the Plan." (Plan at p. 25.)

> "Each Calendar Year, benefits will be paid for the covered charges of a Covered Person that are in excess of the deductible and any copayments. Payment will be made at the rate

shown under Percentage Payable in the Schedule of Benefits. No benefits will be paid in excess of the Maximum Benefit Amount or any listed limit of the Plan." (Plan at p. 25.)

"Covered charges are the Usual and Reasonable Charges that are incurred for the following items of service and supply. These charges are subject to the benefit limits, exclusions and other provisions of this Plan." (Plan at p. 26.)

The "following items of service and supply" include hospital care, physician care and necessary land or air ambulance. (*See* Plan at p. 27-28.)

The Plan defines "Usual and Reasonable Charges" as:

"a charge which is not higher than the usual charge made by the provider of the care or supply and does not exceed the usual charge made by most providers of like service in the same area. * * * *

"The Plan will reimburse the actual charge billed if it is lesser [sic] than the Usual and Reasonable Charge." (Plan at p. 52-53.)

The Plan's Schedule of Benefits provides, in relevant part, that:

"All benefits described in this Schedule are subject to the exclusions and limitations described more fully herein, including, but not limited to, the Plan Administrator's determination that: care and treatment is Medically Necessary; that charges are Usual and Reasonable; that services, supplies and care are not Experimental and/or Investigational. * * * *

"The Plan is a plan, which contains a Network Provider Organization.

"This Plan has entered into an agreement with certain Hospitals, Physicians and other health care providers, which are called Network Providers. Because these Network Providers have agreed to charge reduced fees to persons covered under the Plan, the Plan can afford to reimburse a higher percentage of their fees." (Plan at p. 14)

In order to determine the amount of benefits due under the Plan, the court would need information regarding whether or not each provider is a Network Provider. From Ms. Tovar's testimony that she would need to contact the "PPO Network" for pricing, the court infers that the providers were most likely Network Providers. For Network Providers, the court would need information regarding what the agreed upon reduced charges were for the services and supplies at issue. If any of the providers were not Network Providers, the court would need, at a minimum, information regarding the usual charges made by that provider, and the usual charges made by most providers of like service or supplies in the same area, for the services and supplies at issue. *See, e.g., Florence Nightengale Nursing Service, Inc. v. Blue Cross/Blue Shield of Alabama*, 41 F.3d

1476, 1482-83 (11th Cir. 1995) (upholding trial court's reliance on affidavit submitted by plaintiff in finding rate for nursing care was reasonable). Plaintiff failed to present *any* such evidence at trial.[8]

Although Plaintiff presented billing statements from the providers, undisputed testimony from HealthComp's President, Philip John Musson, established that the amounts in such billing statements are usually higher than the "Usual and Reasonable Charges" covered by the Plan, and are routinely reduced based on the prior agreements with Network Providers (or negotiated down with non-Network Providers). Thus, the billing statements alone are insufficient to establish what the Usual and Reasonable Charges are for the services and supplies at issue.

Further, the Plan includes various provisions for the coordination of benefits with any other relevant insurers, as well as a subrogation provision and an "other insurance" provision which specifically declares that the Plan pays only "excess" benefits when medical payments are available under any vehicle insurance. (*See* Plan at pp. 70-76.) Plaintiff submitted insufficient evidence for the court to determine how the availability of funds from third-party tortfeasors, their insurers, and Ms. Trivitte's own underinsured motorist coverage effect the amount of benefits that were due to Plaintiff under the Plan.

As to the subrogation issue, Plaintiff's counsel made a point of testifying that he asserted claims against the third-party tortfeasors, their insurer and the Estate's underinsured motorist coverage *solely* on behalf of Hobie Trivitte in his individual capacity, and that the settlement proceeds were all paid to Hobie Trivitte, not the Estate. But the question is not whether the Estate

---

[8] In his closing argument, Plaintiff's counsel admitted he didn't know whether the charges were "usual and reasonable." There is no excuse for that lack of knowledge and corresponding lack of evidence. After this court denied Defendants' motion for summary judgment, it expressly invited the parties to move to open discovery if either party determined discovery was necessary. To the extent Plaintiff's counsel could not obtain evidence regarding the reasonableness of the charges without discovery, he should have obtained permission from the court to conduct discovery on that issue. Instead, he chose to do nothing. Plaintiff's counsel fails to explain why he never sought to obtain copies of the UB 92 and HCFA 1500 forms from the providers for use in proving Plaintiff's damages at trial. Nor does he explain why he never sought to conduct discovery regarding what amount of the medical expenses incurred to transport Ms. Trivitte and treat her injuries were "covered" charges under the Plan. While Defendants may have been responsible for determining that amount during administration of the claims, once this matter reached trial that burden was on Plaintiff. Plaintiff cannot rely on Defendants' earlier failure to make the determination to excuse Plaintiff's own failure to do so at trial.

United States District Court
For the Northern District of California

actually received any money from these sources,[9] but rather: 1) how much was available to the Estate; 2) whether the Estate "execute[d] and deliver[ed] all required instruments and papers as well as doing whatever else [was] needed to secure the Plan's right of subrogation" which is a *condition* of payment under the Plan (*see* Plan at p. 76); and 3) whether the Estate did "nothing to prejudice the right of the Plan to subrogate" (*see* Plan at p. 76). It appears from the testimony at trial that the Estate breached the subrogation provision of the Plan by failing to assert a claim against the third-party tortfeasors *before* the Estate's personal representative settled his own claims against them in exchange for the policy limits[10] of their liability insurance.[11] Defendants are not liable for the amount of money that would have been available for subrogation purposes, absent Plaintiff's breach of the subrogation clause. *See Liberty Mut. Ins. Co. v. Altfillisch Constr. Co.*, 70 Cal.App.3d 789, 797 (1977) (where insurance policy contained subrogation provision, acts by insured that cut off insurer's opportunity for subrogation against the tortfeasor under policy's subrogation clause constituted a breach of the implied covenant of good faith and fair dealing by the insured, and relieved insurer of any obligation to pay corresponding benefits under the policy). Defendants also presented evidence showing that up to $200,000.00 was available from Ms. Trivitte's underinsured motorist coverage, some or all of which *should* have been available for

---

[9] The evidence at trial established that the Estate was named as payee on a $200,000.00 settlement with Ms. Trivitte's insurer under her underinsured motorist coverage. Mr. Kilduff's subjective belief that the money belonged to Mr. Trivitte does not resolve serious issues this case raises with regard to both men's fiduciary obligations to seek recovery from that source on behalf of the Estate. And on the record before the court, it is not at all clear that Mr. Trivitte was entitled to recover anything from Ms. Trivitte's underinsured motorist coverage for *his* wrongful death claim. There is no evidence he was a named insured, or in any other way was covered under Ms. Trivitte's policy.

[10] From the fact that a settlement was also obtained from the Estate's *underinsured* motorist coverage, the court infers that the $50,000 Trivitte obtained in settlement with the third-party tortfeasors exhausted the policy limits of their liability policy.

[11] While Plaintiff's counsel made a point of testifying he did not learn benefits might be available under the Plan until April of 2003 (which was after Trivitte settled his own claim against the third-parties and their insurer), as an experienced Plaintiff's attorney it is inconceivable counsel did not realize his actions were jeopardizing the ability of her health insurer, whoever that might be, to seek subrogation. In any event, in order to adequately represent the Estate, counsel should have promptly inquired to determine what health insurance Ms. Trivitte had at the time of her death. No showing was made that any such inquiry was made *before* the Estate's personal representative and counsel decided to pursue the personal representative's claims and to forego pursuing any claims *by the Estate* against the third-parties (despite their respective fiduciary obligations to pursue such claims on behalf of the Estate).

United States District Court
For the Northern District of California

subrogation. Mr. Kilduff testified that the entire $200,000.00 was distributed to himself and Mr. Trivitte. Plaintiff has not shown that *any* benefits remain due after subtracting whatever amount properly should have been available for subrogation.[12]

C. CONCLUSIONS OF LAW

1. Defendants failed to administer the claim and it was deemed denied on July 15, 2003.

2. The proper standard of review in this case is *de novo*.

3. Admission of evidence outside of the administrative record is warranted.

4. Plaintiff failed to carry his burden to submit evidence sufficient to establish what, if any, amount of benefits are due, and thus Defendants are entitled to judgment in their favor.

## II. JUDGMENT

Based on the foregoing findings of fact and conclusions of law.

IT IS HEREBY ADJUDGED, that Judgment be, and hereby is, entered in favor of Defendants and against Plaintiff.

Dated: *5/25/06*

PATRICIA V. TRUMBULL
United States Magistrate Judge

[12] The court does not here imply that Defendants' right to subrogation from the third-party tortfeasors, their insurers and Ms. Trivitte's underinsured motorist coverage had priority over Mr. Trivitte's wrongful death claims. However, neither did Mr. Trivitte's claims have priority over the Estate's claims (and Defendants' attendant subrogation rights). Properly handled, Mr. Trivitte as the personal representative for the Estate, and Mr. Kilduff as counsel for the Estate, should have asserted claims on behalf of the Estate at the same time they asserted Mr. Trivitte's personal claims. The settlements should have then been apportioned between the Estate and Mr. Trivitte, and approval of the appropriate court sought in light of the conflict of interest between Trivitte and the Estate. To the extent the amount the Estate recovered in settlement for medical expenses fell short of the amount of "covered charges" under the Plan, the Plan would have been responsible to make up the difference. On the record before the court, the settlement proceeds totaled $250,000, over three times the medical expenses at issue in this lawsuit. Plaintiff has not established what the appropriate apportionment of the settlement proceeds should have been, nor what amount, *if any*, Defendants would have been responsible to pay absent Plaintiff's breach of the subrogation provision.